Good morning, Your Honor. May it please the Court, Larry Gabriel on behalf of the appellants, the participating policyholders of the State of Executive Law. Your Honor, I believe that the first issue that we may want to discuss is the mootness doctrine as presented in the request by the Court and the briefs that were presented in regard there too. Yeah, we're all arising from the arbitration proceedings. In that regard, we would submit that the mootness doctrine does not apply in the instant case and that it falls within two of the four exceptions to the rule. The first being that there are collateral legal consequences that survive after the arbitration has occurred, that has yet to be resolved, and when there are wrongs capable of repetition yet evade review. In this case, one of the collateral issues that is going to occur should the Court decide not to rule on the basis of mootness is the determination as to whether or not the policyholders have a right to enforce the contract benefits under the contract. The decision of the district court basically whitewashed that right out of contract, saying that the commissioner preempts any ability of the policyholders. Let me back up just a second. So that argument presupposes, the one you're making right now, that the only relief you were seeking here is that which was covered by the arbitration. No, it does not. Well, let me just see if I, when I looked at the complaint, this of course seemed to be a key component of the complaint. No doubt. But it talked about other distributions. Correct. What was that all about? It wasn't spelled out in the complaint. Over the history of the executive life in solvency, there have been many distributions made through the enhancement plan. There has never been, to the best of my knowledge, an accounting to the policyholders of those distributions. It calls into question as to whether or not those distributions were correctly made under the terms and conditions of the enhancement plan and the plan of rehabilitation. Now, are those distributions still in play? Those distributions are definitely in play and continue who knows for how long. There are distributions that occur on a regular basis. There will be distributions that occur as a result of the recoveries that are being made with respect to the cases that are before this court. That may continue after further litigation should those cases go back to the court. There may be other instances where the commissioner has taken steps to recover assets that could still come into the estate. All of those assets are then distributed out through the rehabilitation plan, which includes the enhancement agreement. Those distributions are made through the auspices of NOLGA. No accounting has been made. The fact that NOLGA took the position under the enhancement agreement in the companion case and in the arbitration that they were entitled to certain funds, when clearly they weren't, as the arbitrator ruled, calls into question what has gone on in the past. And so part of the complaint, which is one, is we have a right to participate, we have a right to enforce the contract, and we have a right as the policyholders to know what distributions have been made and whether they have been made correctly. And part of the claim, the declaratory relief action, was for that claim. So if we go on and say, well, are there, therefore, collateral issues which continue? The answer, obviously, yes, with respect to these distributions. They are going to continue. There are going to continue to be disputes. And the policyholders should have that right to do it. The court does not so rule. The policyholders, based on the race judicata factor of the district court's ruling, will be out forever. And that ruling was wrong. Okay. Why don't you switch to the standing issue there? With respect to the standing issue, NOGA has contended that the California Insurance Code preempts, apparently preempts, the right of the policyholders that were spelled out in the contract. The contract stated, the participating covered contract holders are third-party beneficiaries with respect to the obligations of the participating guarantee associations under this agreement. Each participating covered contract holder and the conservator shall be entitled to enforce the rights of the participating covered contract holders and the participating guarantee association obligations with respect to the participating guarantee associations under this agreement. This agreement was negotiated by? Everybody. Everybody. Yes. The best and the brightest in this country. There were lawyers for NOGA. There were actuaries. There were lawyers for the policyholders. There were lawyers for the commissioner. There were lawyers for the lawyers. Everybody reviewed this. And then it went to the court, and it was reviewed again. And then it was reviewed again in the Court of Appeals. There's been a few people that have looked at this language. All of them, whether it was NOGA, whether it was the commissioner, and whether it was the policyholder, read this language and drafted this language where it says, shall have the right. That language is clear. Nobody's going to quarrel with the background there that you just described, but that doesn't necessarily mean that, you know, if the statute prohibits this, and I say if the statute prohibits this, then, you know, so what? All these people thought they were so smart, they just got it wrong. But the statute doesn't prohibit it. All right. So let me ask you this. So when I, you know, there's the Altus case. There's a California Supreme Court case dealing with the attorney general. All right. And that's different, as I see it. There's no contractual agreement at issue in that case. Okay. So as I understand the complaint here, the complaint is brought on the theory that NOGA has violated its obligations under the contract. Correct? Correct. Okay. So, and as I also understand, the commissioner was sued as a third-party defendant. Correct, as an interested party in the contract. And basically took the position of no position. Well, to the contrary, he answered the complaint. He didn't say, come in and say, they don't have the right to do this, dismiss the case. He basically tacitly agreed with the position of the policyholders by answering the complaint and said, okay, we answered it. There's an issue here. Now, does this case differ from Altus simply because you're seeking to enforce the provisions of the contract? Absolutely. The Altus case and the other cases cited in the brief by NOGA where the policyholders weren't allowed to participate were, in essence, collection cases. The commissioner wants to go out and collect assets for the estate. Do the policyholders have a right to butt in? No. Okay. That's his job. That's what he should be doing. Okay. We don't have a right to go every time there's a lawsuit filed to collect an asset. The policyholders go, oh, yeah, we should participate in this because we don't necessarily trust what the commissioner is doing. That's not what we have here. Those cases are distinguishable. This is a contract case. This is a contract to enforce rights for distribution of assets that go to the policyholders. They're directly affected by the language of the contract. They, in the EGLET conservation proceedings, justifiably relied on this language in making an election as to whether to opt in or opt out of the rehabilitation proceedings. They were given a contract. Said, here's the contract. We're going to abide by this contract. If you opt in, you have certain benefits. One of those benefits is to make sure that the guarantee associations do what they're going to do under the contract, and we are going to specifically provide those rights for you. And the policyholders said, well, I can opt out and get my money now and take it, or I can get all of these benefits, supposedly under the enhancement agreement, including the benefit of the rights to enforce the agreement. So was it justifiably reliance? Yes. Is this a collection action? No. That would fall under the statutory powers of the commissioner, for which we have no dispute. We're not trying to do that. And the fact is that under the Atescadero case cited in our brief, the policies came to the court. Atescadero is a bankruptcy court, but we have analogized bankruptcy court to the ELA proceedings throughout the years of this case, and said, look, you made a deal. Notwithstanding the statute or the powers, you made a deal, and it was approved by the court. You should be bound by that contract. Let me ask you this. If we were to assume that the statute basically, well, if you take what the Supreme Court said in Altas, that this is a response, and you read it with the statute, and you say that, as the district court did, that this is an obligation of the commissioner to bring this kind of litigation, would it be contrary to public policy for the commissioner to sort of cede some of his authority to the policyholders? I think under the Altas case, if, for instance, there was a decision to go sue Altas, and the commissioner says, I don't want to do this, but I'll let the policyholders do it. Well, one, it's a question of whether you're doing it under the auspices of the commissioner. But certainly, there would at least be the argument that says, no, the policyholders can't do that independently, and then keep the benefits of it, and not bring it into the estate. But that's not this case. This isn't a collection case. It has nothing to do with the powers of the commissioner, as the commissioner of insurance. This person could have been Joe Schmoe, trustee of the ELIC liquidating trust. So it happens in this case, it's the commissioner that entered into it. But the commissioner, in this case, could have assigned the administration of the ELIC trust to someone else. Now, if the commissioner wasn't involved in this, would the court's decision be the same? Could they then go back and say, under the statute, oh, no, it's only the commissioner's authority, and the trustee is acting in the place of the commissioner, in effect, turning your question around, your honor? And the answer probably would be no there. Again, I get back to the simple proposition that I think that we're faced here is, what do you do with plain, simple contract language that the parties agreed to that was approved by a court? The question I think Judge Pye has asked, and I'll ask it again, is your clients assumed whatever rights third-party beneficiaries have. If the California Supreme Court has said that section 1037 means that the commissioner has exclusive authority to act on behalf of the beneficiaries in a case like this, then that is a restriction on whatever third-party rights you have. So you've only acquired whatever third-party beneficiary rights are available in California, and those rights can be preempted by statute, which appears to be what the California Supreme Court said in Altus. Except, again, I think you have to distinguish between the conduct that the court was addressing in that case. The court didn't say, blanket, in all circumstances, under all factors, the commissioner asked for the policyholders. If that was true, we wouldn't have had Texas Commerce Bank, we wouldn't have had Bank of Freeport, we wouldn't have had the entire litany of appellate decisions, which overruled the decisions of the commissioner with respect to how the estate was administered and the agreements that he entered into. The history of the ELIC is scattered with decisions showing that the commissioner was not the only one who was involved. The commissioner hasn't at all times acted in the best interest of the policyholders, and under finite circumstances, California Supreme Court and the Courts of Appeal have allowed the policyholders to pursue remedies. This is one of those situations. Altus, as I read Altus, there's a little turf war there between the attorney general and the commissioner, although the court was just trying to make sure that the attorney general didn't go too far, because the responsibility for these insurance problems or issues really rest with the commissioner. And to the extent that the attorney general was attempting to act on behalf of the estate, the Cal Supreme Court said, no, you can't do that. But when the attorney general was acting to enforce penalties, whether civil or criminal, the court said, that's fine, Mr. Attorney General, you can do that. Because you have separate roles, you have separate duties, and this case is no different. When I was reading this statute and thinking about this case, there's a clause in the statute that's not really mentioned or elaborated upon or discussed in the briefs, and it's the general powers clause at the end of the statute of 1037. It's after subsection G, and it talks about the enumeration in this article of the duties, powers, and authority of the commissioner. And proceeding under this article shall not be construed as a limitation upon the commissioner, nor shall it exclude in any manner his or her right to perform and to do such other acts not herein specifically enumerated, or otherwise provide for, which the commissioner may deem necessary or expedient for the accomplishment or in the aid or purpose of the act. Now, how does that play into all of this? I'm not sure that it does. I think it's a broad brush provision that says we're trying to cover all of the bases. We don't know what goes on, for instance, in a rehabilitation proceeding, and believe me, the history of this case shows that anything can happen and will happen, and you can't possibly anticipate all of those things, and that's fine. But it doesn't cede to him all powers which were presented in a contract that he signed. Well, one could read this as saying that this gives the authority to the commissioner to do just what he did here. And I would absolutely have to agree with the court on that. Well, I'm not sure. I'm just looking at the statute, that's all. And that's what he did. He entered into a contract modifying, if the powers were, he modified it. And Your Honor is correct to point out that he has a broad brush authority to do that. You want to stay the rest of your time? I would like to. Thank you very much. Good morning, Your Honor. Frank O'Loughlin with Roth, Gerber, Johnson & Lyons from Denver, Colorado, on behalf of NOLGA, which is an acronym for the National Organization of Life and Health Insurance Guarantee Associations. May it please the court. Yes, good morning. I would like to address first the mootness issue, if I may. There's truly no controversy left in this case. If we look at the four claims for relief in the Watson complaint, each specifies very precisely that this is an issue concerning, do these dollars, which have been recovered by the receiver, the commissioner, in the estate, do they get distributed by virtue of Article 10, in which most goes to the policyholders or are accomplished by the state? And Article 17, in which half goes to the policyholders, basically, and half to my client. That is the fundamental of the Watson complaint. All those issues were determined with finality in the arbitration, with the final decision, which has now been entered as a judgment by the Conservation Court. What do we do with the allegations in the complaint that talk about other distributions? Your Honor, there's one paragraph, repeated twice, that talks about other distributions. And it states, basically, in support of, and the context is, both the declaratory relief, there were 11 paragraphs, as well as paragraphs trying to establish commonality to establish a class action. It basically just says, there were also past distributions. There have been distributions for 15 years now. There were also past distributions which went to NOLGA instead of the policyholders under Article 10, versus 17. There is no context, Your Honor. There's no factual basis. There's no notice to my client. There's no claim for relief whatsoever. There is no claim for accounting, as specified in the appellant's brief. It's simply not there. Well, if there's a need for more specificity, you could always challenge the complaint and ask them to re-plead. Your Honor, the case law on this subject basically states that if a claim for relief doesn't survive a mootness finding, if an allegation is not sufficient to stay a claim for relief, then the entire case is moot. And the entire case ought to be dismissed on mootness. Well, they may have more than one claim here. But we can't tell from their complaint. Well, you know, it's federal court. It's notice pleading. You read the complaint very generously. Yes, Your Honor, it would have to be very generous, because honestly, we can't see this as a claim for relief. We have no fundamental factual basis whatsoever. And, Your Honor, assuming that that occurred, this allegation talks about distribution of the assets by the commissioner, which is specifically reserved to him under 1037-F. So it's the same standing issue. It's an appropriate dismissal on standing, including this paragraph. So it would be futile. Okay. So you read the complaint. It's just nothing. This complaint has nothing to do but with this dispute that was addressed by the arbitrator. Yes, Your Honor. And that's it. In the arbitration proceeding, resolve it, end of story, case is over, vacate everything, and dismiss the case. On mootness, yes, Your Honor. Okay. Now, assuming we were to disagree with you, you might as well probably should proceed on to standing, which seems to be the basis for the district courts. Thank you. Your Honor, the exclusive authority vested in the commissioner is essential. It is a legislative mandate with a purpose. Here we have a commissioner who is vested. It is not to pursue, as opposing counsel said, collection items. That's not what the statute says. The statute says that the commissioner shall prosecute and defend any and all suits in connection with administration, liquidation, or other distribution of the assets of executive life. So why would the commissioner enter into an agreement like this? The agreement, Your Honor, is very limited. Section 18.14 doesn't grant full third-party beneficiary rights to these policyholders. It states, you have rights to enforce the obligations of my client, the participating guarantee associations. It's limited to that. The obligations of the participating associations do not include distribution of assets, period. So if the third-party beneficiaries have some rights, under the contract, but don't have rights in this case, what rights did they have? Is this just an empty phrase? No, Your Honor. The enhancement agreement does two things. It provides formulas through which the commissioner distributes assets. It also requires my clients to assess their member insurance companies and to pay and to top off those assets. That is our only obligation that can be enforced under Section 18.14. We are still paying. We've paid over $2 billion to date under the enhancement agreement to top off state assets. We have that continuing obligation to do that for decades, and many hundreds of millions more will be spent. So specifically in response to your question, if my clients someday threw up their hands and said, we're tired of paying, we're not going to do it, then that 18.14 would take effect. And the policyholders, in addition to the commissioner, would say, you have to pay us our guarantee association benefits. But they couldn't sue, would be your argument. No, Your Honor. I think they probably could sue, but they are not state assets. Do you see the difference? The difference being the commissioner has the power to distribute state assets and under 1037-F exclusive. So that is what this lawsuit is about. Distributions of state assets, not distributions by the guarantee associations of money they assess to fulfill their obligation. If NOLGA failed entirely in its obligation, then the third party beneficiaries would have an action under the contract against NOLGA. I believe they would probably have that right. It would probably have to be arbitrated. Could it be preempted by an action by the commissioner? Your Honor, only if the action by the commissioner involved distribution of estate assets, because that's what 1037-F involves, and that's what the Watson complaint involves. So if NOLGA stopped paying its requirements, has nothing to do with estate assets, yes, there is a protection for these policyholders. Then could it be that your real argument here is not so much that they don't have standing here, but they don't have a claim for relief? They don't have a claim for relief. Which is different than standing. But I believe they don't have standing. I believe this complaint is fatally flawed for many, many other reasons which we've addressed. Forget about 12b-6 and whether they state a claim for relief and whatnot. The district court was very narrow. The district court said you can't maintain this action, only the commissioner can do this. Yes, and that's because the complaint involves solely, including that one paragraph we've talked about, solely the distribution of estate assets, which is vested exclusively in the commissioner. Exclusively. And that's all the complaint deals with from A to Z. It deals with nothing else. It doesn't deal with my client's obligations. So let me ask you this. So why can't, let's assume that that's correct. I mean, let's assume. Why can't the commissioner sort of cede some of his authority to the policyholder? Well, that is. Why is that contrary to public policy? And you know, this statute has a savings clause, a general powers clause. Your Honor, a very practical reason. You know, so when they negotiate, let's say I don't know what happened in these negotiations. It must have been very complex to arrive at this agreement and whatnot. But let's just say that the policyholder said, we want this right, you know. And the commissioner says, well, you know, I don't want to give it to you. And they say, ah, we want it. And finally the commissioner says, well, in order to get a deal here we'll give you that right. Why is that contrary to public policy? And why can't he do that? Why doesn't this statute sort of save him and allow this to happen? First of all, the general powers certainly would not allow him to cede and give up his discretionary powers. And I believe that's contrary to law. It's contrary to public policy. There's many good reasons. Public policy. Well, Kay says that. And why hasn't he entered this litigation and said, you know, I object to it. You know, they can't maintain this lawsuit. Your Honor, all I can say is the commissioner did answer the complaint and did deny the key portions of that complaint. But you kept quiet throughout this litigation. Yes, Your Honor. Sort of like hiding. Your Honor, I would also point out that the commissioner, when we filed our letter with the court that this matter is moot, the commissioner basically allowed us to add a statement that he does not object. What do you think he would say if we asked, if we don't hear your views on... I believe he would say... What would he say? He would say look at the cases. Carranza-Hernandez, Altus. I have exclusive authority. You're treading on my toes. Do we get to ask him this question in the next case? I think you ought to, Your Honor. Although I'd be glad to answer the questions for the commissioner. I think we should sign our 32H duty to give notice to counsel. Your Honor, in addition that I believe it is contrary to the law to give those kind of powers to a non-commissioner. But they were very defined and very limited. Under the contract, the obligations, he didn't just grant blanket kind of authority. It's kind of very narrow and comes under this contract. He didn't grant the permission to pursue any of his powers whatsoever to these policyholders. He agreed to a provision that says if the policyholders wish to enforce NOGA's obligations under this contract to make the payments that they have to make, he agreed to that. Those are not estate assets. It has nothing to do with estate assets. He granted none of his power to these policyholders. There's a good reason for this statute, 1037. There are 294,000 policyholders. It's already a morass of litigation. Imagine if they could bring these kinds of lawsuits. The Watson complaint is solely based on distribution of estate assets. 1037 exclusively gives that authority to the commissioner. Your Honor, I believe that we have covered all of my points. I would like to point out that section 18.14, which the appellants rely on, that when Judge Matz issued his order, it was very limited. It said you cannot have standing to pursue anything with respect to the prosecution of suits concerning distribution of estate assets. It did not go beyond that and say 18.14 is stricken. It can never be applied. It has no meaning. The concept that, my gosh, 18.14 will never be able to pursue our rights is not found within the District Court's order. Your Honor, unless you have further questions, I would be pleased to submit the case. Thank you. There are 290,000 reasons why the policyholder has remade moot in this case, Your Honor, to address your question. To go against the policyholders. 290,000 being the number of policyholders? Why the commissioner hasn't... And the number of voters that come with this. Counsel, that begs the question that Mr. Laughlin just made, which is, that's a lot of people possessing third-party rights to pick at anything that gets done here and keep this litigation in perpetuity. It suggests that maybe California has had good reasons for wanting to grant exclusive authority to a single party to be able to protect the assets of the estate. Your Honor, the answer... How many of these policyholders do you represent? Well, theoretically, all of them, because it was... Correct. And one of the things that we have found throughout these proceedings is that the policyholders, yes, people could come in on an individual basis and file objections, and they have, but in the main policyholder groups got together on various aspects and went ahead and made challenges. Those challenges were they... The answer, perhaps, is yes. Let me address one thing Mr. Laughlin was talking about, and that is the allegations of the complaint. We discussed this at the very outset. It is not limited to the arbitration proceedings. It asks for an accounting of the distributions. So distributions are made through NOGA. So even in the narrow reading that NOGA would portray to the court, which I believe is wrong as to that language, that claim has been presented. It may not have been a picture of clarity. We asked the court leave to amend, and in his order, which was Appendix 7 to the brief, he denied that right to amend the complaint. That alone is abusive discretion, I believe. Under the rules of the Ninth Circuit, we should have gotten at least one shot to have amended the complaint. What do you say in response to the argument that the district court's order only really applies to estate assets? That's the distinction counsel drew between non-estate and estate assets. Well, I think what he was alluding to is if you look at the language of the enhancement agreement as to whether or not that provision would allow the policyholders to go further than the distributions. I read it differently than him. Surprisingly, I think he takes a very narrow view, and if you look at it, it says the rights of the participating policyholders, and the participating guarantee associations' obligations with respect to the participating guarantee associations under this agreement. They have been distributing assets throughout. That's what we had sought to challenge. That is what we sought to get information about. That's what the other claims of relief are. And we're entitled to that, even under their narrow view of what this language says. This case should be remanded. We should be entitled to amend the complaint. We should be entitled to seek declaratory relief that we want. Thank you. Okay. Thank you. We appreciate your arguments. Interesting case. Matter will be submitted. Judge Paez, how about a short recess? Yes, okay. That's fine. The court will take a ten-minute recess.
judges: Nelson, Paez, Bybee